IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

DIANE SYLVESTER                                                    PLAINTIFF

v.                              Civil No. 09-6014

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                     DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Diane Sylvester, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying her claim for supplemental security income ("SSI") under Title XVI of the Social

Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial

review, the court must determine whether there is substantial evidence in the administrative

record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

## I.     Procedural Background:

The plaintiff filed her application for SSI on September 22, 2005, alleging an onset date

of October 12, 1990, due to status post nephrectomy, status post anterior cervical fusion from

C4-6, facet sclerosis at the L4-5 and L5-S1 levels, degenerative changes of the lumbar spine,

bipolar disorder with paranoia and hallucinations, chronic depression, panic attacks with

agoraphobia, hypertension, chronic neck and back pain, memory loss, insomnia, nightmares,

anxiety, headaches with dizziness, knee pain, and degenerative joint disease ("DJD") of the

knees and ankles.  (Tr. 71, 75, 95-97, 98-99, 104, 105, 114, 176, 182, 191, 196, 250, 253, 286).

Her applications were initially denied and that denial was upheld upon reconsideration.  (Tr. 40-

42).  Plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ).  An

administrative hearing was held on March 20, 2008.  (Tr. 288-308).  Plaintiff was present and represented by counsel.

At this time, plaintiff was 52 years of age and possessed an eighth grade education.  (Tr. 291, 293).  She had past relevant work experience in housekeeping, laundry, and bars.  (Tr. 86-89, 292-293).

On August 29, 2008, the ALJ found that plaintiff's degenerative disk disease, cervical and lumbar spine status post fusion C5-4, and adjustment disorder with mixed emotional features were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (Tr. 14).  After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity to perform light work with occasional kneeling, stooping, crouching, and overhead work.  (Tr. 15-16).  Mentally, he also found plaintiff limited to work where the interpersonal contact is incidental to the work performed, the tasks must be learned by rote with limited judgment, and the supervision required for routine tasks is little with detailed supervision required for non-routine tasks.  (Tr. 16).  With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a poultry deboner/eviscerator, dry cleaning worker, or sorter/grader.  (Tr. 21).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on January 30, 2009.  (Tr. 4-6).  Subsequently, plaintiff filed this action.  (Doc. # 1).  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  (Docs. 7, 8).

AO72A
(Rev. 8/82)

II.   **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

3

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  *See* 20 C.F.R. § § 404.1520(a)- (f)(2003).  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**III.**   **Evidence Presented:**

    **A.**   **Mental Impairment(s):**

On September 16, 2005, plaintiff underwent an intake assessment with Community Counseling Services.  (Tr. 176-183).   Ms. Kathy Gladden, a counselor, performed the assessment.  Plaintiff was a survivor of Hurricane Katrina and noted flashbacks of dead people covered up, a baby covered in a bloody sheet, a teen who had her throat cut, and stepping on a dead body.  Her symptoms included nightmares, loss of appetite, insomnia, crying spells, and panic attacks.  Plaintiff had also been shot in 1990 when she confronted a man who was trespassing in her apartment building.  As a result, she lost a kidney and now suffered from lower back problems as well as numbness in her arm and hand due to cervical vertebrae fusion surgery.  Plaintiff stated that she had attempted suicide on two occasions, once by cutting her wrist and once by overdosing on sleeping pills.  However, she had no insurance or money and did not

4

receive mental health treatment.  Her current medications included Effexor and Trazodone.  Ms. Gladden noted that plaintiff's mood was depressed, her affect/attitude tearful and blunted, her orientation full, her speech normal, her motor behavior normal, her thought processes logical/responsive, her thought content appropriate, her attention/concentration distracted/preoccupied, her memory intact, her insight/judgment normal, and her intelligence below average.  Plaintiff was tearful, depressed, and had difficulty talking initially.  Ms. Gladden determined that plaintiff had difficulty putting words to paper.  She diagnosed her with post traumatic stress disorder ("PTSD"), loss of a kidney, and back problems.  Ms. Gladden then assessed her with a global assessment of functioning score ("GAF") of 50.  (Tr. 176-183).

On September 23, 2005, plaintiff reported feeling better and less anxious.  (Tr. 175).  She was receiving support and assistance from a woman who had taken her and another woman "under her wing."  This woman was helping plaintiff make contact with the appropriate agencies to access the different types of assistance available.  Plaintiff had secured an apartment and made contact with the Charitable Christian Medical Clinic ("CCMC") to access medication management.  She continued to report nightmares and fear, but was coping better overall. (Tr. 175).

On October 26, 2005, plaintiff continued to have some PTSD symptoms although she was making progress in her living situation.  (Tr. 174).  She had settled into her Section 8 housing, but looked at the window and discovered that she lived directly across the street from the Convention Center, which reminded her of the New Orleans Convention Center.  This caused her to feel panicky and to experience flashbacks.  Plaintiff placed aluminum foil over the window so she could not see out.  She also reported having a panic attack when she could not find her

5

pliers to open a window.  Ms. Gladden noted that plaintiff was doing better than she had been and that she seemed to have hope.  (Tr. 174).

On December 3, 2005, plaintiff underwent a mental status examination and evaluation of adaptive functioning with Dr. Janet L'Abbe.  (Tr. 115-121).  Plaintiff reported multiple symptoms consistent with anxiety and depression to include panic attacks, sadness, diminished motivation, poor self-esteem, and suicidal ideation.  She felt a sense of impending doom and experienced difficulty sleeping at night due to intensive recollections related to having money and a television stolen by a man she trusted.  Although she did admit experiencing thoughts of harming herself, she was not suicidal.  Plaintiff reported anhedonia, fatigue, depressed appetite, cognitive rumination, and an inability to fall asleep and stay asleep.  She stated that she did not leave her apartment and was socially withdrawn.  Plaintiff also indicated that the pain in her neck made it difficult for her to work.  Plaintiff told Dr. L'Abbe that she had been attending outpatient counseling since she had relocated to Arkansas from Louisiana during Hurricane Katrina.  She had found counseling to be beneficial because she felt more comfortable after each session was completed.  (Tr. 115-121).

Plaintiff was pleasant, cooperative, and tearful.  Her affect was anxious and her mood dysphoric.  (Tr. 115-121).  She seemed fearful and held her coat and purse on her lap during the evaluation.  Her speech was spontaneous, linear, and concrete.  She was able to communicate effectively and could be understood.  Plaintiff admitted seeing movement out of the corner of her eye for no apparent reason, and sometimes felt a presence in her home.  She also admitted to drinking an average of two beers per night, but denied ever having been in legal trouble due to alcohol.  Dr. L'Abbe estimated plaintiff's IQ to be between 71 and 79.  Although plaintiff

reported problems with memory, testing revealed her problems to be consistent with depression rather than suggestive of organicity. She diagnosed plaintiff with major depression, PTSD, and arthritis. Dr. L'Abbe noted that plaintiff's condition was likely to improve over the next twelve months. Plaintiff admitted that she could get herself up and bathe most days. However, she was not eating because she was out of money. Plaintiff did not drive due to never having an operator's license. She did do her own shopping, laundry, and cooking and managed her own finances with some assistance from the bank. (Tr. 115-121).

On January 9, 2006, plaintiff reported for her counseling session with Ms. Gladden. (Tr. 173). She was active and cooperative and noted to be making progress. At this time, plaintiff was informed she could no longer come for individual therapy, but could participate in group therapy. She seemed ok with this and stated that she would begin attending group sessions. Plaintiff stated that she felt less traumatized , but continued to worry about supporting herself. She had applied for disability, but was still waiting to hear. Plaintiff's mood was fairly stable and she continued to get her medication through CCMC. (Tr. 173).

On April 15, 2006, plaintiff was discharged from Community Counseling Services. (Tr. 171-172). Records indicate that plaintiff had been seen for intake and three other sessions and was showing signs of improvement. However, she had failed to reschedule appointments on eight occasions. She had been able to secure housing with the Housing Authority, food stamps, and medical management through CCMC. Plaintiff had made improvement in her PTSD symptoms as well. Although she was offered to continue group services, she had not followed through. Her GAF upon discharge was 55. (Tr. 171-172).

7

On November 8, 2006, plaintiff underwent a mental status examination and evaluation of adaptive functioning with Dr. Charles Spellman.  (Tr. 215-218).  Plaintiff stated that her disability was her back pain.  She was shot in 1990 in the pelvis and had experienced pain ever since.  She also reported severe pain in her neck, pain all over, and high blood pressure.  Plaintiff indicated that she spent most of her time in bed.  Plaintiff was coherent and relevant.  She bordered on being pleasant at times and at other times seemed a little complaining.  Her effort was often not good.  She came across as one who was not accustomed to putting forth any effort. Plaintiff was spontaneous and her thought processes were organized and logical.  She claimed to pick at tiny bugs on her skin that were smaller than pin points.  Although her skin did appear to have been picked at, Dr. Spellman did not note any bugs.  Plaintiff's affect was appropriate for content and her mood was dysphoric.  She claimed to have memory problems, stating that she sometimes forgot to take her medication unless she filled her pillbox, sometimes ran her bath water and forgot to bathe, and often forgot to comb her hair before going outside.  Dr. Spellman diagnosed plaintiff with adjustment disorder with mixed emotional features secondary to pain. Her communication was good in all areas.  She reported getting along well with others, and Dr. Spellman noted no evidence of unusual passivity, dependency, aggression, impulsiveness, or withdrawal.  Her concentration, persistence, and pace were good and there was no evidence of malingering or exaggeration.  Plaintiff lived alone, performed her own housework slowly due to discomfort, prepared meals, shopped, went to church occasionally, managed her own funds, associated with neighbors, and watched television.  Plaintiff ended the evaluation by stating that she needed to get a job but that it hurt to work.  FEMA cut her off the previous month and this had placed her in a real bind.  (Tr. 215-218).

8

**B.**     **Physical Impairment(s):**

On September 10, 2005, plaintiff sought emergency treatment for left hip pain, pelvic pain, panic attacks, and insomnia.  (Tr. 209-214).  She also wanted her blood sugar level checked.  Her blood pressure was 163/96.  Plaintiff was diagnosed with hip pain and arthritis. She was prescribed Effexor, Naprosyn, and Desyrel.  (Tr. 209-214).

On September 20, 2005, plaintiff reported a history of hypertension, arthritis, pain in her back, cramps in her legs, and mental illness.  (Tr. 200).  Plaintiff was displaced by Hurricane Katrina and needed medication refills. Tenderness was noted over the left SI joint.  Plaintiff was diagnosed with GERD, hypertension, depression, and back pain. Dr. Katherine Hurst prescribed Tylenol Arthritis and Mobic.  Plaintiff's previous medications had been Effexor, Desyrel, Clonidine, Premarin, and Naprosyn.  (Tr. 200).

X-rays of plaintiff's cervical spine dated November 21, 2005, revealed anterior cervical fusion from the C4 to the C6 level with surgical screws in the C4 and C6 and fibular graft material at the C4-5.  (Tr. 105).  Normal alignment was identified.  X-rays of her lumbar spine revealed mild disk space narrowing at the L5-S1 and facet sclerosis at the L4-5 and L5-S1 levels. (Tr. 105).

On November 22, 2005, plaintiff underwent a physical with Dr. Marvin Kirk.  (Tr. 106-114).  Records indicate that it was a "Social Security Physical."  Plaintiff complained of chronic lower back and neck pain.  She reported a history of cervical fusion in August 2003 due to a ruptured cervical disk, but stated that she received very little pain relief from the surgery. Plaintiff rated her neck pain as a ten on a ten-point scale.  In addition, she reported cramping chest pain and a chronic cough.  Plaintiff also complained of mental impairments including

9

nervousness, poor sleep, low energy, poor concentration, poor memory, fatigue, panic attacks with agoraphobia, fear of dying, PTSD due to her experience during Hurricane Katrina, paranoia, auditory hallucinations, and depression.  Dr. Kirk asked her about her bipolar symptoms and she admitted to experiencing irritable mood, mood swings, insomnia, and easy distractibility.  During her manic phase, she was reportedly grandiose, spoke very fast,  became over focused on things, and experienced racing thoughts.  Her medications were said to include Trazodone, Effexor, Clonidine, Premarin, and Naproxen.  (Tr. 106-114).

An examination revealed slightly elevated blood pressure and a limited range of motion in her cervical and lumbar spine.  (Tr. 106-114).  Plaintiff's straight-leg raise test was also abnormal.  Spasms of her trapezius, post cervical tenderness of the lumbar spine and gluteal muscle, and left sciatica were also noted.  In addition, Dr. Kirk reported left arm weakness. Plaintiff was able to hold a pen and write, touch fingertips to palm, pick up a coin, and stand and walk without assistive devices.  However, she had only 60% grip strength and could not squat and arise from a squatting position.  Dr. Kirk diagnosed plaintiff with chronic neck pain, severe post disk surgery pain, lower back pain of unknown etiology, sciatica of the left leg, bipolar mood disorder with persistent hallucinations, chronic depression, panic attacks with agoraphobia, PTSD, and hypertension.  He concluded that she was severely limited with mental disorders and was moderately to severely limited due to back and neck pain.  (Tr. 106-114).

On January 3, 2006, plaintiff was tearful stating that she needed blood pressure medication.  (Tr. 199, 229).  Reportedly, she had not taken this medication since before November 2005.  Plaintiff was also suffering from cold symptoms and headaches.  Dr. Hurst diagnosed plaintiff with GERD, accelerated hypertension, depression, and a headache.  She then

10

prescribed Clonidine.  (Tr. 199).  A daily prescription report indicated that plaintiff was taking Effexor XR, Mobic, Clonidine, Desyrel, Premarin, and Lisinopril.  (Tr. 230).

On April 5, 2006, plaintiff felt faint and weak and was experiencing shortness of breath. (Tr. 198, 231).  She also felt drowsy daily, which the doctor felt was due to Clonidine.  At this time, her blood pressure was 132/96. Dr. Hurst diagnosed her with hypertension and depression. She increased plaintiff's dosage of Effexor, prescribed Lisinopril, and prescribed ASA.  Dr. Hurst then went over the medications with plaintiff stating that she had a history of noncompliance.  Plaintiff indicated that she was to begin a part-time job as a housekeeper the following day.  (Tr. 198).

On April 27, 2006, plaintiff complained of dizziness with her medication and discomfort in the chest area between her breasts.  (Tr. 196, 233).  Dr. Hurst noted that plaintiff was still sleepy, watching television all night, and sleeping during the day.  She diagnosed plaintiff with hypertension and depression.  Plaintiff was told to continue the Lisinopril/HCTZ, prescribed Acetylsalicylic ("ASA"), and was told to increase her dosage of Effexor.  (Tr. 196).  A note at the bottom of this record indicated that plaintiff was taking Clonidine, rather than Lisinopril/HCTZ.  As such, plaintiff was prescribed Lisinopril.  (Tr. 196).

On May 16, 2006, plaintiff followed-up with Dr. Hurst at CCMC regarding her hypertension.  (Tr. 194, 237).  At this time, she also stated that her chest was "full of mucus and sinus congestion."  Further, plaintiff reported two panic attacks the previous day.  She had not been taking her Effexor or Lisinopril/HCTZ because they caused emesis.  Dr. Hurst diagnosed her with hypertension, depression/anxiety, GERD, and acute bronchitis.  She directed plaintiff

11

to stop the Lisinopril/HCTZ and switched her to Norvasc and Clonidine. Plaintiff was also prescribed Mobic, Mucinex, and Doxycycline. (Tr. 194).

On June 13, 2006, plaintiff had a follow-up at CCMC regarding her depression and anxiety. (Tr. 191, 238). Her anxiety level was high with panic attacks reported often. Plaintiff also complained of neck pain and lower back pain that radiated to her pelvis with some sensation in her feet. The back pain kept her up at night. She reported that her blood pressure readings were staying very high. Plaintiff was working, but was stressed out due to the fear of being evicted. An examination revealed tenderness in the sacrum and paraspinous lumbar area. Plaintiff was diagnosed with hypertension, depression, and multiple allergies. Dr. Hurst prescribed Toprol XL, Elocon cream, Flexaril, and lower back exercises. (Tr. 191).

On August 8, 2006, plaintiff complained of abdominal pain radiating around to her back and decreased sleep. (Tr. 242). Plaintiff underwent a pelvic examination and was diagnosed with Trichomoniasis and prescribed Flagyl. (Tr. 242).

On September 12, 2006, plaintiff sought treatment for the flu. (Tr. 250). She reported a productive cough with phlegm. Plaintiff stated that she was doing a couple of sit-ups for her lower back, but that she had to quit her job because her knee was swelling and hurting. She also admitted that she was not taking her blood pressure medication as prescribed. An examination revealed scratches to her left arm and right leg, increased blood pressure, and increased glucose. Dr. Hurst diagnosed plaintiff with a history of a neck injury, DJD of the knees and cervical spine, accelerated hypertension, anxiety/depression, and a poor social situation. She also noted increased glucose and self mutilation issues. Dr. Hurst prescribed ASA, increased her dosage

12

of Toprol, increased her dosage of Effexor, and prescribed Mobic, Mucinex, and steam. She also advised plaintiff to stop smoking and referred her to a dentist. (Tr. 250).

On October 11, 2006, plaintiff was upset over a letter and forms that she needed her doctor to sign. (Tr. 253). Plaintiff stated that she was forgetful and had just been going from room to room. She was also picking at her fingernails. Plaintiff was reportedly unable to swallow the Effexor XR pill and had run out of Mobic. Dr. Hurst diagnosed plaintiff with hypertension, depression, PTSD, and DJD of the knees and ankles. She noted that plaintiff needed assistance organizing her medication. She advised plaintiff to decrease the BC powder and take Mobic instead. She also changed plaintiff to Zoloft, which was a smaller pill, and prescribed Depakote. Plaintiff was advised to stop taking the Premarin and referred for a psychological evaluation. (Tr. 253).

On October 25, 2006, plaintiff indicated that she did not like to take her medications and go outside of her house because they made her sleepy. (Tr. 258). Dr. Hurst did note some improvement in that plaintiff was not picking at her nails and her knee had improved with Mobic. An examination revealed irritability, spasm in the left lumbar area, and tenderness over the left buttock. Plaintiff indicated that she had walked to her appointment in the rain and did not have a way home or a ride to get blood drawn for lab tests. Dr. Hurst diagnosed her with PTSD, depression, hypertension, osteoarthritis, and lumbar muscle strain. She indicated that plaintiff's blood pressure had responded to Toprol, but plaintiff was experiencing a lot of fatigue. Therefore, her dosage was decreased. Her Zoloft dosage was increased, and she was advised to apply warm, moist heat to her back and to perform gentle stretching exercises. Dr. Hurst also

13

recommended that she take Tylenol and prescribed Ultram.  Plaintiff indicated that she was on the right track and finally taking her medication regularly.  (Tr. 258).

On January 23, 2007, plaintiff was out of her medications.  (Tr. 261).  She complained of lower back pain, indigestion, and problems on Zoloft.  Dr. Hurst noted plaintiff was not particularly compliant with her medications.  She had been stretching them out.  Plaintiff stated that the Zoloft made her dizzy and the Depakote hurt her stomach.  Dr. Hurst observed that plaintiff was again picking at her legs, nails, and cuticles, but was a little better even though she was off Zoloft.  Plaintiff complained of arthritis pain in her pelvis, lower back pain, and sticking pain, but indicated that the Ultram helped.  Dr. Hurst diagnosed her with a history of PTSD, depression, and hypertension.  She prescribed Toprol, Norvasc, and Clonidine.  She also restarted plaintiff on a lower dose of Zoloft.  In addition, Dr. Hurst advised her to discontinue the Depakote because she did not believe plaintiff was bipolar.  (Tr. 261).

On February 27, 2007, plaintiff followed-up concerning her back pain.  (Tr. 264).  She stated that she was doing back exercises sometimes and wanted to try and get her job back.  She needed a doctor's note for this, but also indicated that she was applying for disability.  She had been out of her medication for three days due to a lack of money.  Plaintiff also refused to take the Celebrex stating, "I lost my momma to that."  Dr. Hurst diagnosed plaintiff with hypertension, depression, a history of PTSD, a history of cervical fusion, and mild irritability.  She prescribed a low salt diet, Arthrotec in lieu of Celebrex, Desyrel, lower back exercises, and calcium and vitamin D supplements.  She also advised plaintiff to stop smoking.  (Tr. 264).

On March 27, 2007, an EKG revealed sinus bradycardia, left atrial enlargement, and left ventricular hypertrophy.  (Tr. 266).

14

On May 29, 2007, plaintiff complained of something going on with her feet. (Tr. 267). She stated that it felt as though glass was suck in the ball of her left foot. Plaintiff had recently stepped on glass. She also complained of left flank pain and stated that it hurt to move or to lay down. An examination revealed tenderness of the second and third metatarsal heads. Dr. Hurst noted that her self mutilation issues were better. She also diagnosed her with hypertension, depression, and left musculoskeletal pain. Dr. Hurst then changed her Zoloft to Cymbalta, ordered x-rays of her left foot and lumbar spine, prescribed Tylenol and Mobic, prescribed Wellbutrin, and prescribed Requip. (Tr. 267).

An x-ray of plaintiff's left foot date June 1, 2007, revealed some soft tissue swelling near the right MP joint, but no significant arthritic changes, fractures, or other bone lesions. (Tr. 224). This same date, an x-ray of her lumbar spine revealed mildly osteoporotic bones but normal alignment and disk space. Numerous scattered small metallic buck shot pellets were present, but none appeared to be within the spine. (Tr. 225).

On July 31, 2007, plaintiff reported cramps all over her body when lying down, primarily in her legs and arms. (Tr. 270). She also complained of left foot pain. Plaintiff was sleeping well, alert, and her affect was bright. An examination revealed a callus and fissure on the plantar surface of her left foot. Plaintiff was prescribed an orthotic left shoe, Flexeril, and medication to treat her muscle cramps. (Tr. 270).

On October 30, 2007, plaintiff complained of chest congestion, a cold, the skin splitting on the bottoms of her feet, and a knot in her thumb/wrist area. (Tr. 272). An examination revealed tenderness in the left maxillary sinus and a healed fissure on the bottom of plaintiff's left foot. Dr. Hurst diagnosed plaintiff with hypertension, an upper respiratory infection, and a

AO72A
(Rev. 8/82)

possible sinus infection.  She prescribed Guaifenesin, Proventil, Doxycycline, and a moisturizer. (Tr. 272).

This same date, Dr. Hurst wrote a note indicating that she hoped her previous letter regarding plaintiff's request for her job did not jeopardize her employment.  (Tr. 274).  Dr. Hurst stated that plaintiff really needed to work close to home and that it was difficult for her to work several consecutive days.  However, she indicated that plaintiff needed a job and was willing to work.  Dr. Hurst admitted that plaintiff had several medical problems, but believed she was stable and could work.  (Tr. 274).

On January 22, 2008, plaintiff sought treatment for a rash. (Tr. 275).  She also continued to have a bit of a wheeze.  Dr. Hurst diagnosed her with hypertension, depression, asthma, and contact dermatitis of the face and bottom.  She prescribed Doxycycline, Prednisone, Vaseline, Guaifenesin, and Seroquel.  (Tr 275, 278).

On March 18, 2008, plaintiff continued to have problems with itching on her face and bottom.  (Tr. 280).  Dr. Walter Wyricker at CCMC prescribed Elocon ointment.  He diagnosed her with xerosis and neurodermatitis.  (Tr. 280).

On June 18, 2008, plaintiff sought treatment for an earache, dental pain, and dry scaly patches of skin on her legs.  (Tr. 282).  An examination revealed multiple caries and some excoriations and hyperpigment lesions on her extremities.  Dr. Hurst diagnosed plaintiff with restless legs, hypertension, GERD, neurodermatitis, dental carries, depression, and insomnia. Plaintiff was referred to a dentist and directed to use bug spray and apply lotion to her legs.  (Tr. 282).

16

On August 19, 2008, plaintiff complained of pain, swelling, and slipping in her right knee. (Tr. 286). She had been out of medication for two months. Plaintiff had been to New Orleans and dancing a lot. An examination revealed small effusion of the right knee without instability and tenderness on range of motion. Dr. Hurst diagnosed her with right knee swelling and hypertension. She advised her to restart the Naprosyn and to rest, ice, compress, and elevate her right knee for two weeks. Plaintiff was given crutches and allowed to be partial weightbearing. (Tr. 286).

IV.   **Discussion**:

Plaintiff contends that the ALJ erred in his credibility assessment of plaintiff, by failing to properly evaluate the severity of plaintiff's physical impairments; failing to evaluate the severity of plaintiff's mental impairment; and concluding that plaintiff retained the residual capacity to perform a full range of light work.

A.   **Subjective Complaints/Severity of Impairments:**

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents her from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th

17

Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

At the onset, plaintiff alleges that the ALJ "made vague references to medical records," and failed to properly explain what medical evidence he considered when he assessed plaintiff's residual functional capacity. However, the ALJ discussed plaintiff's medical history and identified the medical records he relied upon in rendering his decision. He also considered each of plaintiff's impairments singularly and in combination with her other impairments.

### 1. <u>Physical Limitations</u>:

In the present case, plaintiff alleged disability due to status post nephrectomy, status post anterior cervical fusion from C4-6, facet sclerosis at the L4-5 and L5-S1 levels, degenerative changes of the lumbar spine, bipolar disorder with paranoia and hallucinations, chronic depression, panic attacks with agoraphobia, hypertension, chronic neck and back pain, memory

loss, insomnia, nightmares, anxiety, headaches with dizziness, knee pain, and degenerative joint disease ("DJD") of the knees and ankles. (Tr. 71, 75, 95-97, 98-99, 104, 105, 114, 176, 182, 191, 196, 250, 253, 286).

Records do indicate that plaintiff was shot in 1990, requiring the removal of a kidney. Although the buck shot has remained in her body, there is no evidence to indicate that this has disabled plaintiff. In fact, the most recent x-ray results showed the buck shot, but noted that none appeared to be within the spine. (Tr. 225). Only mild osteoporosis was noted with normal alignment and disk space. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

Plaintiff had also undergone cervical fusion surgery in 2003 and continued to experience residual pain following surgery. The evidence does indicate that plaintiff sought treatment for neck pain. However, we can find no evidence to support plaintiff's contention that her pain was disabling. X-rays of plaintiff's cervical spine dated November 21, 2005, revealed anterior cervical fusion from the C4 to the C6 level with surgical screws in the C4 and C6 and fibular graft material at the C4-5. (Tr. 105). However, normal alignment was identified. She was noted to have a limited range of motion in her cervical spine during a physical examination in 2005, but all records indicate that plaintiff received only conservative medication treatment for her pain. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). As such, we find substantial evidence to support the ALJ's finding that, although severe, plaintiff's neck pain did not meet one of the listings.

19

During the relevant time period, plaintiff also voiced fairly consistent complaints of lower back pain. X-rays of her lumbar spine performed in November 2005 revealed mild disk space narrowing at the L5-S1 and facet sclerosis at the L4-5 and L5-S1 levels. (Tr. 105). However, an x-ray performed in 2007 showed only mildly osteoporotic bones with normal alignment and disk space. *See Forte*, 377 F.3d at 895. A review of the medical records does indicate that plaintiff exhibited a limited range of motion in her lumbar spine during a general physical examination in 2005. This pain was treated via conservative measures only. *See Smith*, 987 F.2d at 1374. Although plaintiff was not always medication compliant, when taken as prescribed, plaintiff indicated that the medication reduced her pain. (Tr. 261). *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). Further, plaintiff's back pain was found to be severe by the ALJ and factored into plaintiff's RFC.

Plaintiff also sought treatment for knee pain and swelling that responded well to treatment. *See id.* We also note that plaintiff only sought treatment for this pain on a few occasions. *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments). And, she was reportedly dancing in 2008, an activity clearly inconsistent with a claim of severe pain.

Insomnia was another problem alleged by plaintiff, and the record does indicate that plaintiff sought treatment for this on numerous occasions. However, plaintiff had reported not taking her anti-depressants and pain medications as prescribed. (Tr. 199, 250, 261, 264). *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended

20

course of treatment . . . weighs against a claimant's credibility."). She began taking her medications more regularly in late 2006, and in July 2007, indicated that she was sleeping well. (Tr. 270). Because plaintiff's insomnia responded to treatment, we can not say that it was disabling. *See Brown*, 390 F.3d at 540.

Likewise, plaintiff was diagnosed with hypertension. However, records dated earlier in the relevant time period indicate that plaintiff did not take her medication as prescribed. (Tr. 199, 250, 261, 264). *See Guilliams*, 393 F.3d at 802. Late 2006, plaintiff became compliant with her medications and her blood pressure responded to Toprol. Although she later experienced additional problems with her blood pressure, plaintiff had again begun to ration her medication and was not taking it as prescribed. As her condition was responsive to treatment when the medication was taken properly, we can not say that plaintiff's hypertension rendered her disabled. *See Brown*, 390 F.3d at 540.

Although plaintiff alleges headaches and dizziness as additional grounds for disability, these were symptoms related to her hypertension. As previously discussed, when her medication was taken as prescribed, these symptoms subsided. Accordingly, we find them to have been responsive to treatment. *See id.*

### 2.   Mental Impairments:

Records indicate that plaintiff also suffered from depression and anxiety. While she also alleged symptoms of memory loss, it was concluded that these symptoms were related to her depression rather than organic in nature. (Tr. 115-121). Plaintiff was prescribed medication to treat her anxiety and depression, but as with her other medications, plaintiff did not always take them as prescribed. *See Guilliams*, 393 F.3d at 802. However, when she did take her

AO72A
(Rev. 8/82)

medication, her symptoms improved. *See Brown*, 390 F.3d at 540. And, plaintiff was able to get along with others. As such, we can not say that her symptoms prevented her from performing all work-related activities.

Plaintiff's PTSD also seems to have responded well to treatment. *See id*. Plaintiff indicated that counseling was beneficial to her. (Tr. 115-121). Further, when taking her medication as prescribed, Dr. Hurst noted that her symptoms improved. (Tr. 258, 261). *See id*. She reported fewer panic attacks, flashbacks, and nightmares and less difficulty sleeping. As such, although plaintiff's PTSD does have an impact on her ability to perform work-related activities, we do not find it to be totally disabling.

Further, we note that none of plaintiff's treating doctors have concluded that plaintiff was disabled or unable to perform a limited range of light work. *See Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) (observing that none of the plaintiff's treating physicians offered an opinion that the plaintiff was disabled or made any statement or recommendation that he was unable to work at an SGA level). While we note Dr. Kirk's conclusion that plaintiff's physical impairments were severe and her mental impairments were moderate to severe, we do not find support for this in his one time consultative examination. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence). Although he noted a limited range of motion in plaintiff's cervical and lumbar spine, weakness in her left arm, some muscle spasm and tenderness, and a reduced grip strength, Dr. Kirk performed no objective tests to verify his assessment of severe physical impairment. He also provided no explanation as to his definition of severe and whether plaintiff remained capable of performing any level of work.

AO72A
(Rev. 8/82)

Dr. Kirk's assessment is also contradicted by other medical evidence of record, especially the records from Dr. Hurst indicating that plaintiff was stable and capable of returning to work. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) ("The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.").

### 3.   <u>Activities of Daily Living</u>:

Plaintiff's own reports concerning her daily activities also undermine her claim of disability. On an adult function report, plaintiff reported her daily activities as follows: go to the bathroom, wash face, fix a light breakfast if hungry, go back to bed, watch television, go back to sleep, wash the breakfast dishes, take medication, go back to bed and watch television until fall asleep, straighten up apartment if feel like it, and eat a small dinner. (Tr. 78). She also indicated that she went outside daily to check the mail; attended medical appointments once per month; shopped for groceries once per month; could prepare her own simple meals; could use public transportation; could go out alone; could shop for food, clothing, household needs, and medications; could pay bills, count change, handle a savings account, and use a checkbook/money order; could perform light cleaning, do the laundry, and iron for short periods of time; could watch television four to five hours daily; spent time with others (doctor and family helping her with personal hygiene); played cards; and, talked on the phone. (Tr. 78-85, 90-97). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d

448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

### 4.   **Continued Work**:

Perhaps the most damaging, however, is plaintiff's own testimony that she was working for the Housing Authority checking on the laundry, sweeping up, delivering Resident Council Newsletters, and sitting on the resident board.  (Tr. 294).  In addition, she performed catering work for the Convention Center when she was needed.  (Tr. 296).  "Seeking work and working at a job while applying for benefits are activities inconsistent with complaints of disabling pain." *Dunahoo*, 241 F.3d at 1039; *Wiseman v. Sullivan*, 905 F.2d 1153, 1156 (8th Cir. 1990) (search for work and finding part time employment is inconsistent with disability); *See Johnson*, 108 F.3d at 180 (the Commissioner cannot find a claimant disabled for the period when he was receiving unemployment compensation).  Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work.  *See Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir.2005); *Gowell v. Apfel,* 242 F.3d 793, 798 (8th Cir.2001).

Although plaintiff contends that this work accommodated her impairments and allowed her to pay for her medication, we can find no evidence to suggest that work accommodations were made for plaintiff.  Plaintiff did tell her doctor that she had stopped working in 2006 due to knee pain and swelling, but plaintiff requested Dr. Hurst's assistance in getting her job back in 2007.  In fact, reading Dr. Hurst's letter dated October 2007, it appears as though plaintiff was willing to perform whatever tasks were necessary.  And, Dr. Hurst indicated she was stable and

24

capable of returning to work.  As such, we believe plaintiff's continued work after her onset date is some evidence of plaintiff's ability to perform work-related activities and is inconsistent with her claim of disability.

### B.    Non-severe Impairments:

Plaintiff asserts that the ALJ erred by failing to find her joint pains to be severe impairments.  An impairment is not severe if it amounts only to a slight abnormality that would have no more than a minimal effect on the claimant's physical or mental ability to do basic work activities.  *See Bowen v. Yuckert,* 482 U.S. 137, 153, 158 (1987); 107 S.Ct. 2287 (O'Connor, J., concurring); *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007); 20 C.F.R. § 404.1521(a). Basic work activities are defined as the abilities and aptitudes necessary to do most jobs ...." 20 C.F.R. § 404.1521(b).  These include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; use of judgment; understanding, carrying out, and remembering simple instructions; responding appropriately to supervision and co-workers; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).  It is the claimant's burden to establish that his impairment or combination of impairments are severe. *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir. 2000).

Although plaintiff did seek medical treatment for knee pain and swelling on a few occasions during the relevant time period, we can find no evidence of an ongoing pattern of treatment or persistent symptoms related to joint pain.  (Tr. 250, 253, 258).  As previously discussed, plaintiff was treated for back and neck pain and this was considered in the ALJ's RFC assessment.  However, there are no x-rays to indicate that plaintiff had a physiological impairment of the knee or ankle.  Plaintiff told Dr. Hurst that the Mobic improved her knee pain.

25

As long as she was taking it as prescribed, her condition improved.  (Tr. 258).  *See Forte*, 377 F.3d at 895 (holding that lack of objective medical evidence is a factor an ALJ may consider).  In fact, in 2008, plaintiff admitted that she had been dancing quite a bit and that the pain and swelling had returned.  (Tr. 286). As plaintiff was clearly able to dance in spite of her knee problems, we can not say that plaintiff's joint pain constituted a severe impairment that impacted her ability to work.

While we note that plaintiff was diagnosed with panic disorder with agoraphobia, we also note that she was able to work outside of her home and participate as a member of the Housing Authority's resident board.  Individuals with agoraphobia generally fear public places.  Had plaintiff truly been suffering from severe agoraphobia, it would not have been possible for her to do this.

Plaintiff also reported a diagnosis of bipolar disorder.  However, the only diagnoses contained in the file were made based on plaintiff reporting a history of bipolar disorder.  After treating plaintiff for an extended period of time, Dr. Hurst did not agree with this diagnosis.  (Tr. 261).  In fact, she had plaintiff discontinue Depakote, the medication prescribed to treat bipolar disorder.  Accordingly, we do not find that plaintiff actually suffered from bipolar disorder.

**C.    Economic Hardship:**

Plaintiff contends that her failure to seek more consistent treatment and take her medication as prescribed should be dismissed due to economic hardship.  Clearly, if the claimant is unable to follow a prescribed regimen of medication and therapy to combat her disabilities because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits.  *Tome v. Schweiker,* 724 F.2d 711, 714 (8th Cir.1984).  While these

26

hardships can be considered in determining whether to award a claimant benefits, the fact that she is under financial strain is not determinative. *Benskin,* 830 F.2d at 884.  Notes indicate that plaintiff was receiving medical treatment through a low-cost medical assistance clinic.  On at least one occasion, she was advised to seek certain medications through a drug assistance program.  However, there is no indication that plaintiff ever did so.  Further, there is no indication that she sought out other services that would have enabled her to obtain her prescription medications for free or at a reduced cost.  Accordingly, we can not say that her failure to take her medication as prescribed is excused by her financial strain.

**D.     The ALJ's RFC Assessment:**

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence.  RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  A disability claimant has the burden of establishing his or her RFC.  *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004).  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,*  245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the

27

claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, and the RFC assessments of several non-examining, consultative doctors. Contrary to plaintiff's argument, the ALJ did not conclude that plaintiff could perform a full range of light work. He found plaintiff could perform light work with occasional kneeling, stooping, crouching, and overhead work. (Tr. 15-16). Mentally, he also found plaintiff limited to work where the interpersonal contact is incidental to the work performed, the tasks must be learned by rote with limited judgment, and the supervision required for routine tasks is little with detailed supervision required for non-routine tasks. (Tr. 16). Therefore, plaintiff's argument in this regard is without merit.

On December 20, 2005, Dr. Alice Davidson reviewed plaintiff's medical records and completed a consultative physical RFC assessment. (Tr. 146-153). She determined that plaintiff could perform light work involving occasional stooping and crouching. Dr. Davidson also found plaintiff to be limited with regard to reaching in all directions. (Tr. 146-153, 160-167).

On January 4, 2006, Dr. Brad Williams, a non-examining consultative physician, completed a psychiatric review technique form ("PRTF"). (Tr. 122-135). After reviewing plaintiff's medical records, he diagnosed her with depression and anxiety. He was of the opinion that plaintiff experienced mild restrictions in activities of daily living and moderate limitations in social functioning and maintaining concentration, persistence, and pace. No episodes of decompensation were noted. (Tr. 122-135).

28

This same date, Dr. Kay Gale completed a mental RFC assessment. (Tr. 142-145). She also reviewed only plaintiff's medical records and determined that plaintiff had moderate limitations in the following areas: ability to understand, remember, and carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; ability to perform at a consistent pace without an unreasonable number and length of rest periods; and, ability to interact appropriately with the general public. Dr. Gale found plaintiff to have no significant limitations in any of the other areas. However, she concluded that plaintiff could perform work where the interpersonal contact was incidental to the work performed, the complexity of the tasks was learned and performed by rote requiring few variable and little judgment, and the supervision required was simple, direct, and concrete. (Tr. 142-145). This opinion was affirmed by Dr. Williams on December 20, 2006. (Tr. 144).

As previously noted, Dr. Kirk was the only physician to opine that plaintiff would have severe limitations in her ability to work. Again, he examined plaintiff on only one occasion and seems to have relied upon her subjective complaints when rendering his diagnoses. Aside from a physical exam, he performed no objective tests to substantiate his conclusion that plaintiff's mental and physical limitations were severe. As his conclusions are not supported by the overall record, we can not say the ALJ erred in concluding that plaintiff is capable of performing a limited range of light work.

We note plaintiff's argument that her chronic neck and back pain met Listings 1.02 and 1.05, however, as stated before, plaintiff has provided no objective evidence to support her contention that she suffers from radiculopathy or instability of her knee. Contrary to plaintiff's

29

argument, no instability was ever found in plaintiff's knee.[1]  The examination performed by Dr. Hurst found no instability.  She was diagnosed with right knee swelling in 2008 and prescribed crutches, but there is no objective evidence to indicate that plaintiff had a significant problem in her knee.  There is also no evidence to show that this problem was ongoing for twelve consecutive months or longer.

Further, plaintiff's contention that her mental impairment meets Listing 12.04 must also fail.  Dr. Hurst concluded that plaintiff was not suffering from bipolar disorder.  Further, as previously indicated, the evidence does not support a finding that plaintiff suffered from agoraphobia to the degree that it would impact her ability to work as evidenced by plaintiff's continuing to work after her onset date.  Although she did suffer from depression and anxiety, there is no evidence to show that plaintiff experienced episodes of decompensation, that a minimal increase in mental demands or change in environment would be predicted to cause decompensation, or that she was unable to function outside a highly supportive living arrangement.  She was never hospitalized for her condition and failed to seek treatment from a mental health professional after 2005.  In fact, the evidence shows that plaintiff's mental impairments were responsive to treatment when she took her medication.  The record also clearly reveals that Dr. Hurst was of the opinion that plaintiff could return to work.  Plaintiff even proved her ability to perform light, unskilled work by seeking out work and working during the relevant time period.  Accordingly, the ALJ's RFC will stand.

---

[1]The medical abbreviation *s* stands for without, while the term *c* means with. Treatment notes indicate that plaintiff's knee was swollen *s*  (without) instability.  (Tr. 286).

30

### E.    **Vocational Expert's Testimony:**

Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence.  *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir.1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

The vocational expert testified that a person of plaintiff's age, education, and work background who could perform light work requiring only occasional kneeling, stooping, crouching, and overhead work; is limited to unskilled work; and, could have interpersonal contact with others that is incidental to the work performed, the tasks performed are learned by rote and require limited judgment, and the tasks require little supervision for routine tasks and detailed supervision for non-routine tasks, could still perform work as a poultry deboner/eviscerator, dry cleaning worker, or sorter/grader.  (Tr. 305-306).  As the records indicates that plaintiff was able to perform part-time work as a janitor and a caterer during the relevant time period, we find substantial evidence to support the ALJ's determination that plaintiff could perform these jobs.

## V.    **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision

AO72A
(Rev. 8/82)

should be affirmed.  The undersigned further finds that the plaintiff's Complaint should be

dismissed with prejudice.

DATED this 5th day of May 2010.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

32